PHILLIP R. MURPHY, Plaintiff-Appellee, *v.* JEWEL COMPANIES, INC., Defendant-Appellant.

(No. 73-41;

Second District—November 27, 1974.

2

SEIDENFELD, J., dissenting.

Hubbard, Hubbard, O'Brien & Hall, of Chicago (A. G. Hubbard, Sam L. Miller, and Frederick W. Temple, of counsel), for appellant.

Charles M. May, of Hall, Meyer, Fisher, Holmberg, Snook & May, of Waukegan, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This is an appeal from the judgment of the trial court pursuant to the verdict of the jury in favor of the plaintiff. The complaint contained a wilful and wanton count and the verdict was a general verdict for $150,000.

The defendant contends there was no evidence to sustain the wilful and wanton charge; that the plaintiff was guilty of contributory negligence, and that the evidence failed to prove any negligence of the defendant which was a proximate cause of the injury.

The facts are simple, although the evidence is conflicting, on key points. The plaintiff, riding a motorcycle, had turned right from Green Bay Road onto Central Avenue, an east-west four-lane highway and was riding westerly on Central Avenue in the inner lane at a speed which he estimated was 35 to 40 miles per hour when the accident occurred. The

defendant's tractor and trailer was going east on Central Avenue and at a point about 600 feet west of Green Bay Road, the tractor and trailer made a left turn to enter the Jewel Tea Co. parking lot, at which point the plaintiff's motorcycle collided with the rear portion of the trailer. The point of entry into the parking lot was that always used by Jewel Tea delivery vehicles; however, it actually was the exit from the parking lot for the general public and was marked: "One Way—Do Not Enter." Testimony established that the size of the Jewel Tea parking lot did not allow entry of large trailers via the usual entrance used by the public and it was necessary, in order for these large vehicles to pull around behind the building to the receiving dock, for entry to be made by way of what was normally the exit. These deliveries were always made early in the morning before the store was open for business and before the parking lot was being used by the public.

The driver of the rig testified that he was not familiar with the location of the entrance to the parking lot, not having been there before, but that he had been told by other drivers who had made deliveries there to proceed past the usual entrance and enter the lot at the point of exit, which was the second driveway.

The defendant's driver, Mauge, who had been joined as a defendant but, on plaintiff's motion, was dismissed from the suit with prejudice at the close of the plaintiff's case, testified that he activated his left turn signal at a point about 95 yards from the entrance to the parking lot, just after coming to a stop-and-go light, and started edging over into the inner lane. A Mr. Greenwald, who was in his car directly behind the truck just prior to the accident, testified that he saw the left turn signal activate, that he pulled from behind the truck over into the extreme right lane and that at that time he saw the motorcycle coming down the hill 75 to 100 feet from the truck. On cross-examination, however, he stated that the truck driver may not have put on his turn signal until 2 or 3 seconds before beginning his turn. A Mr. William Good, who was the transportation supervisor for the defendant, Jewel Tea Co., at the time, and a Mr. David Waldron, a police officer, both testified that the plaintiff, Murphy, made a statement to said police officer at the hospital, shortly after the accident, stating: "If I was paying attention, it wouldn't have happened." The police officer further testified that the plaintiff told him that he did see a turn signal on the vehicle.

At the trial, the plaintiff stated he did not observe any turn signals operating and the driver, Mauge, testified he did not observe the motorcycle until after he had made his turn and had gone across the road so that the trailer was on the apron of the parking lot and the rear portion of the trailer was blocking both westbound lanes of Central

Avenue. The plaintiff, who testified he observed the trailer at a distance of two to five car lengths—roughly 35 to 90 feet—braked and downshifted his motorcycle but was unable to avoid striking the rear wheels of the trailer, causing permanent injuries to the plaintiff.

While the foregoing statement of the facts is admittedly sketchy, it is sufficient, we believe, for a consideration of what we consider to be the decisive issue in this appeal—that is, the propriety of the instruction on wilful and wanton conduct, objected to by defendant both at the time the instruction was given and in the post-trial motion. The defendant contends it was error on the trial court's part to submit this issue to the jury at all, since there was so little evidence to sustain the charge of wilful and wanton conduct, and as a matter of law it should have been removed from the case.

It is the plaintiff's theory that the design of defendant's parking lot was so defective as to indicate a conscious disregard for the safety of the plaintiff and other members of the public. The accident occurred, the plaintiff contends, by reason of the fact that the defendant (1) designed a parking lot where the defendant's supply vehicles were required as a practical necessity to enter the lot against the normal flow of traffic and (2) allowed a driver unfamiliar with the location to attempt a delivery under the adverse condition of having to make an abnormal entry. This combination of circumstances, the plaintiff maintains, caused the driver to be distracted so that he neglected to give a timely signal of his intention to turn left or to see the plaintiff approaching. The plaintiff does not contend that the design of the lot in and of itself amounts to wilful and wanton conduct, but he says the design of the lot, together with allowing an unfamiliar and unaccompanied driver to make the delivery—this combination of facts—constituted wilful and wanton conduct. Hence, the plaintiff argues, if these facts are established, the jury is within its province in bringing in a verdict based on wilful and wanton conduct.

■■ Although no precise definition of wilful and wanton conduct is possible, what constitutes wilful and wanton conduct has been described or summed up in many Illinois cases. It is clear that it is broader than ill will, for some of the cases contain no element of ill will; on the other hand, it goes far beyond mere inadvertence such as we find in the case of ordinary negligence, for it requires a conscious disregard for the safety of others.

The recent case of *Hocking v. Rehnquist* (1969), 44 Ill.2d 196, 201, cites the language of *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, as to what amounts to wilful and wanton conduct:

" 'A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care. to prevent it or a failure to discover the danger through recklessness, or carelessness when it could have been discovered by the exercise of ordinary care.' "

In his charge to the jury, the trial court gave the IPI instruction 14.01 as follows:

"When I use the expression 'wilful and wanton conduct' I mean a course of action which shows an utter indifference to or conscious disregard for the safety of others."

This instruction was objected to both as to form and as going beyond the scope of the evidence.

■■ While we agree with the plaintiff that whether certain specific acts amount to wilful and wanton conduct is a question for the jury to determine (*Blitenthal v. Dressler* (1973), 18 Ill.App.3d 751; *Richichi v. City of Chicago* (1964), 49 Ill.App.2d 320; *Ficht v. Niedert Motor Service, Inc.* (1962), 34 Ill.App.2d 360) this statement is subject to the general rule established by the case of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494. That case, in discussing and summing up the several viewpoints in various jurisdictions and the inconsistencies in prior Illinois decisions on the question of when the issue of negligence or wilful and wanton conduct may properly be removed from the consideration of the jury, said, at page 510:

"Nor, as earlier stated, does it seem to us that the any-evidence rule or any of its variants (no conflict in the evidence; scintilla rule) is entirely satisfactory, for literal application thereof prohibits direction of a verdict even though the evidence relied upon in opposition is so overwhelmingly rebutted that no verdict based thereon could possibly stand. In such instances no action other than a directed verdict is consonant with efficiency in our judicial system and with a fair and expeditious termination of litigation.

Rather, we believe the rule is best which in some form finds favor in other States heretofore indicated and which has, in part, been heretofore recognized in this State. In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

While the above stated quotation refers to directed verdicts and judgments *n.o.v.* an even greater degree of proof should be required in deny-

ing a motion for a new trial. The court in the *Pedrick* case in commenting on the degree of proof required for *granting* a new trial, as compared with the directing of a verdict, said, at pages 509-10: "[W]e believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial. It is not our intention by this opinion to alter this concept." The *Pedrick* case has not been overruled nor qualified to our knowledge and was quoted with approval in *Hocking v. Rehnquist, supra,* and *Breslin v. Bates* (1973), 14 Ill.App.3d 941.

■■ Applying the standard of *Pedrick* to the necessarily broad and general definitions found in the Illinois cases as to what constitutes wilful and wanton conduct, we must determine whether, in the light of all the evidence adduced, when viewed in its aspect most favorable to the plaintiff, a verdict for the plaintiff based on wilful and wanton conduct cannot stand. If so, the issue of wilful and wanton conduct should not have been submitted to the jury.

The plaintiff's theory of the case on wilful and wanton conduct, as counsel's closing argument and the appeal brief disclose, is based on the idea that the defendant's driver was distracted and uncertain when he approached the turning point, due to the combination of (1) an entry point which was designated "one way" in the other direction and (2) the driver's unfamiliarity with the location of his required turn into this lot. By allowing these two conditions to exist simultaneously, the plaintiff says, the defendant invited an accident and is therefore guilty of wilful and wanton conduct. The plaintiff concedes, by implication, that the design of the lot is not in and of itself sufficient basis for a charge of wilful and wanton conduct. This is obvious, for actually the lot was designed like other parking lots with an exit and an entrance, the exit being marked, "One Way—Do Not Enter" with an arrow showing the direction of normal traffic flow. However, the lot was too small for the defendant's large rigs to turn around behind the building unless entry was made at the point marked, "One Way—Do Not Enter." The purpose of this sign and the direction of traffic was obviously intended for customers of the store, the general public. The undisputed evidence was that the Jewel Tea trucks made their deliveries about 7 to 7:30 A.M., this being before the store was open for business. It is not the plaintiff's theory, and no evidence was submitted, that the plaintiff was induced to believe through the sign, "One Way—Do Not Enter," that the defendant's truck would not turn at that point. Indeed, the plaintiff testified that he did not see any turn signals being given by defendant and his explanation of the accident appears to be, not that the defendant

turned at the wrong place, but that he (the plaintiff) did not expect the defendant to turn at all.

The unexpectedness to the plaintiff of the turn is in keeping with plaintiff's theory that the driver of the trailer was uncertain as to the proper turn-in, that he was searching for the right place, and, having found it unexpectedly, he turned on his signals and immediately made his turn. But, the plaintiff's surprise at the driver's turn is not evidence that the driver was confused or distracted. The plaintiff testified he did not observe any signal at all; the driver testified he put his signal on when he started to veer into the inner lane, about 95 yards before his turn, and the one eyewitness, other than the parties, stated he noticed the turn signals go on prior to, but maybe as little as 2 or 3 seconds before the driver started his turn. Had the driver's conduct indicated in any way or his testimony acknowledged that he was confused or uncertain in making his turn, this would be evidence which might be connected up with the use of the wrong way entrance and the driver's unfamiliarity with the scene, in fashioning a theory of wilful and wanton conduct on the part of the defendant Jewel on the theory that by using the awkward entrance and then sending a new driver to contend with it, defendant invited the accident. But, there is no reason to suppose from the record itself that the driver was worried, uncertain or confused. He did not so indicate in his testimony. In answer to the question from defense counsel, "In other words before you turned did you notice that you had the arrows pointing against you?" the driver answered, "I didn't pay much attention to the arrows." Nowhere is there any evidence to sustain the plaintiff's theory that the driver was uncertain, bewildered or distracted by the situation of making his turn into an unfamiliar driveway. He testified he had been told by a fellow driver to turn into the second driveway—the one past the entrance driveway—and this is what he did. We cannot, therefore, add to the design of the lot the uncertain state of mind of the driver due to his unfamiliarity with the proper entrance point because there is nothing in the record itself to indicate the driver was uncertain, puzzled or distraught by the circumstances. In view of this being a driver of some 19 years experience it is not to be assumed that he was so disturbed by having to go into an entrance marked, "One Way—Do Not Enter," that he neglected to exercise his usual professional skills, especially since the reason for doing so was explained beforehand by a fellow driver. The driver only did what he had in mind to do from the beginning of the trip.

Whether a count of wilful and wanton conduct could be supported on the basis of a misuse of an exit if no precautions were taken and

the injury occurred as direct result of such misuse, we need not decide for aside from the fact that such is not the plaintiff's theory of the case for wilful and wanton conduct, there is no evidence that the exit was misused in such a way as to cause injury to the plaintiff, and we do not see how the theory of wilful and wanton conduct can be predicated on the mere fact that during the early morning hours the Jewel drivers used what is normally the exit as an entrance. There is no showing that this misuse induced the accident. Had the sign "One Way—Do Not Enter" not been there at all and the driver had made the same turn at the same time and without giving a timely signal, the same result would have occurred, without any effect at all from the design of the lot. While the jury found that the conduct of the driver was negligent, there is no evidence tending to show that his alleged negligent conduct would have been any different if the sign in question had not been there. The driver's testimony was that he was looking for the second driveway. When he found it he turned. The design of the lot is not really involved at all.

■■ It appears to us, therefore, that there was no basis for the instruction to the jury on the issues of wilful and wanton conduct. Under the standard of the *Pedrick* case, we believe the issue of wilful and wanton conduct could not be sustained on the basis of the present trial record. It was, therefore, error for the trial court to instruct the jury on this issue.

■■■ Where a complaint is in two counts, one based on simple negligence and the other on wilful and wanton misconduct, the law presumes that a general jury verdict is based on the wilful and wanton count (*Greene v. Noonan* (1939), 372 Ill. 286, 300). By giving the instruction on wilful and wanton misconduct the trial court virtually eliminated any question of the plaintiff's contributory negligence, yet the record indicates this was a question not free from doubt. Moreover, it is well known that the existence of a malice count often induces a higher jury verdict than might result from a case based on simple negligence. It seems obvious, therefore, that if not legally justified, the trial court's denial of the motion to remove the wilful and wanton issue from the jury's consideration was prejudicial to the defendant.

For the reasons expressed above, the judgment of the trial court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

GUILD, J., concurs.

Mr. JUSTICE SEIDENFELD dissenting:

I dissent. Whether there has been wilful and wanton conduct in any given case necessitates close scrutiny of the facts disclosed by the evi-

dence since in most instances they are wholly dissimilar from case to case. (*Mower v. Williams* (1949), 402 Ill. 486, 489; *cf. Gaiennie v. Fringer* (1955), 5 Ill.App.2d 403, 412.) Applying the *Pedrick* (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510) rule to the evidence in this record, I would reach the conclusion that the trial court did not err in allowing the jury to decide the issue of wilfulness and wantonness. The rule requires the evidence to be viewed in its aspect most favorable to the plaintiff.

The majority opinion goes into the conflicting evidence at great length to reach the conclusion that it overwhelmingly favors the defendant on the wilful and wanton issue. The trial court, however, may not substitute its judgment for that of the jury if there is any substantial factual dispute. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 504.) The trial court recognized this, but the majority, in my view, has not, and has substituted its judgment for that of the jury.

The evidence in its aspect most favorable to the plaintiff, however, is that just prior to the accident, the defendant driver was looking for the proper entrance. Defendant testified that he first saw plaintiff when his tractor was on the apron of the driveway to the parking lot. Yet, a disinterested witness who was driving behind the defendant testified that he saw the truck as it started its immediate turn and moved across the oncoming lanes, and that he was able to see the motorcycle. The defendant drove his tractor and trailer across oncoming lanes of traffic without stopping. He knew the size of his truck as well as the time which would be required for his truck to clear the oncoming lanes. Notwithstanding his duty to be sure that no traffic was approaching from any distance which would result in a collision while his vehicle blocked the lanes of traffic, he made the turn without stopping in flagrant disregard of that duty.

The evidence also denotes an emergency situation created by the defendant, and supports the propriety of allowing a factual determination of the wilfulness and wantonness issue. See *Gaiennie v. Fringer*, 5 Ill.App.2d 403, 411; *Haskett v. Baker* (1971), 1 Ill.App.3d 441, 443. Contrast *Hocking v. Rehnquist* (1969), 44 Ill.2d 196, 201, which involves an emergency situation not of defendant's own creation.

Under all the circumstances, I would conclude that the evidence is not overwhelmingly in favor of the movant, and that therefore the question of wilfulness and wantonness becomes a factual question which was properly submitted to the trier of the facts and which the jury resolved in favor of the plaintiff. (See *Delany v. Badame* (1971), 49 Ill.2d 168, 177; *Chmiel v. Pierce* (1973), 9 Ill.App.3d 130, 133.) I would therefore affirm the judgment below.